PIERCE BAINBRIDGE BECK PRICE & HECHT LLP
Andrew E. Calderon (SBN 316673)
acalderon@piercebainbridge.com
355 South Grand Ave., 44th Floor
Los Angeles, California 90071
(213) 262-9333

PIERCE BAINBRIDGE BECK PRICE & HECHT LLP
Christopher N. Lavigne (NY Bar No. 4811121)
(Pending *Pro Hac Vice* admission)
clavigne@piercebainbridge.com
277 Park Avenue, 45th Floor
New York, NY 10172
Tel.: (646) 694-9666
Fax: (646) 968-412

*Attorneys for Plaintiff Payward, Inc., d/b/a Kraken*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| **PAYWARD, INC.**, a California Corporation, d/b/a **KRAKEN**,<br><br>Plaintiff,<br><br>v.<br><br>**NATHAN PETER RUNYON.**, an individual, and **DOES 1 through 10**, inclusive.<br><br>Defendant. | Case No.: 3:20-cv-2130<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Payward, Inc. d/b/a Kraken ("Payward" or "the Company") alleges the following:

**INTRODUCTION**

1. Payward is a global cryptocurrency exchange that critically relies on trade secrets and confidential business information to maintain the security of its operations. Because of the nature of its business, Payward is subject to constant physical and electronic hacking attempts, and the security of Payward's physical business locations, employees, and business and customer data is of the utmost importance to ensure Plaintiff's successful and continuing business operations.

2. This action seeks to hold Defendant Nathan Peter Runyon, a former employee of Payward, accountable for unlawfully accessing and misappropriating Payward's confidential business information and trade secrets and for violating his confidentiality agreement with Payward.

3. Payward employed Defendant as a financial analyst in its San Francisco, CA office from March 26, 2018 until August 1, 2019. Before his employment began, Defendant signed a Confidential Information and Invention Assignment Agreement on March 14, 2018 (the "Confidentiality Agreement") that bound him to protect and maintain in strict confidence the information and data he became aware of, accessed, and stored through his employment with Payward.

4. In connection with his hiring and employment by Payward, Defendant was repeatedly made aware of, and bore witness to, the paramount necessity for confidentiality surrounding Payward's business. This need for confidentiality in all aspects of Payward's business includes numerous security measures ranging from, for example, protection of sensitive customer electronic account information to safeguarding the confidentiality of the physical locations and addresses of Payward's offices.

5. In connection with Defendant's employment, Payward issued Defendant a laptop for use in his day-to-day activities and responsibilities at Payward. During the course of Defendant's employment at Payward, he accumulated a large amount of financial, business, customer, technical, and economic proprietary information and data in the form of, among other

things, documents, emails, and internal Company communications, all of which Defendant stored on his Company-issued laptop.

6. Payward terminated Defendant's employment on August 1, 2019.

7. Payward was acutely aware of the sensitive, confidential, and trade-secret information contained on Defendant's laptop computer. Accordingly, immediately upon Defendant's termination from the Company, Payward instructed Defendant to return the laptop to Payward. Additionally, Defendant was obligated under the Confidentiality Agreement to return Company property, including the laptop, to Payward immediately upon his termination.

8. Despite repeated attempts by Payward to collect the laptop from Defendant, he refused to return the laptop to Payward. Instead, Defendant strung Payward along with false promises to return the laptop while he could continue to access the confidential and trade secret information on the laptop.

9. On August 2, 2019, Defendant claimed he could not return the laptop to Payward because he may be going on a vacation. On August 6, 2019, he stated he would keep Payward updated on his return from vacation and when he could return the laptop. Payward followed up with Defendant on August 14, 2019, seeking clarity on when Defendant would return the laptop. Defendant sent a series of emails stating he would return the laptop on successively later dates.

10. Eventually, Defendant stated he would return the laptop to Payward on August 29, 2019. However, when that date arrived, Defendant emailed Payward and said the laptop had been stolen from his vehicle. To date, the laptop has not been recovered.

11. Defendant continued to access the trade secrets and confidential business information on his Company laptop while in unlawful possession of it. Defendants became aware he was accessing and sharing the confidential and trade secret information contained in the laptop because he produced a copy of confidential Company board minutes in connection with his threat of a lawsuit against Payward, which he eventually filed in San Francisco Superior Court. Plaintiff would only have access to the board minutes through his employment at Payward.

12. Defendant revealed additional confidential and trade secret information in connection with his lawsuit against Payward, which alleges he was discriminated and retaliated

against by Payward based on his veteran status and disabilities and his reporting of certain alleged stock vesting discrepancies. The confidential and trade secret information stored on and accessible through Defendant's laptop was extensive. The information and data he possessed on his laptop went well beyond the information necessary to support his lawsuit against Payward. Indeed, much of the information was completely unrelated to the lawsuit.

13. Among Defendant's most blatant and unnecessary disclosures of confidential and trade secret information was Defendant's public exposure of the physical address of Payward's headquarters, which, up to the date of Defendant's publicly-filed lawsuit, had not been publicly disclosed, through great efforts by Payward to protect the confidentiality of that address.

14. Defendant has first-hand knowledge of Payward's efforts to keep the physical addresses of its offices, including its headquarters, confidential. Defendant worked at Payward's headquarters, and was subject to and aware of Payward's requirement, for example, that all employees and visitors sign non-disclosure agreements regarding the whereabouts and physical address of Payward's headquarters. Defendant knew that Payward instead made public only a mailing address for its headquarters that is geographically distinct from the headquarters' actual address.

15. Defendant's publication of the physical address of Payward's headquarters breached the Confidentiality Agreement and Payward's standard confidentiality practices, which are and were well known to Defendant. Defendant's publication of Payward's physical address, known to him only through his work for Payward and specifically his work at that address, was intentional and malicious.

16. Defendant's misappropriation of Payward's trade secrets and the breach of his confidentiality agreement have required that Payward spend money and time mitigating the immediate risk of harm and significant continued risk of future harm created by Defendant's failure to return his laptop upon his termination as required by the Confidentiality Agreement, his continued access to the confidential business and customer information and trade secrets on that laptop, his (at best) carelessness with the laptop that led to it purportedly being stolen by an

unknown third party, and his public revelation of the confidential physical address of Payward's headquarters.

## PARTIES

17. Payward, Inc. d/b/a Kraken is a California corporation, incorporated in the state of Delaware, with its principal place of business in San Francisco, California.

18. Defendant Nathan Peter Runyon is an individual and citizen of California who is believed to reside at 456 South Van Ness Avenue, San Francisco, CA 94103.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction because Payward has asserted claims against Defendant pursuant to 28 U.S.C. § 1331 for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") and 10 U.S.C. § 1030 for violation of the Computer Fraud and Abuse Act ("CFAA"). This Court has supplemental or pendent jurisdiction over Payward's remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so related to Payward's federal DTSA claim that they form part of the same case or controversy under Article III of the United States Constitution.

20. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) because Payward and Defendant are residents of San Francisco, CA. Venue is also appropriate in this district pursuant to 28 U.S.C, § 1391(b)(2) because the events that gave rise to this complaint occurred in this district.

## FACTUAL ALLEGATIONS

**A.     Payward Is One of the Largest and Oldest Bitcoin Exchanges in the World**

21. Payward formed in 2011 in the nascent market of cryptocurrency trading and launched its trading platform two years later in 2013. Payward's trading platform allows customers to buy and trade Bitcoin and other cryptocurrencies online. Payward has grown to become a leading platform with hundreds of employees and operations spanning the globe.

22. The cryptocurrency trading market is intensely competitive. Security is among the leading factors that consumers consider when selecting a trading platform and a critical element for business growth. Payward's reputation for security translates to consumer confidence

and leads to greater usage.  Greater usage helps improve liquidity—how easily assets can be bought or sold at a stable price—by raising trade volume and active traders.  Increased liquidity in turn attracts more consumers.

23.     The cryptocurrency trading industry is exceptionally prone to hacking attempts and exploitation of trade secrets.  The rise in popularity and value of cryptocurrencies has made trading platforms a prime target for hackers.  See Brian Fung, Why bitcoin exchanges keep getting hacked – and how to protect yourself, The Switch, June 20, 2018 ("The price of bitcoin took a tumble early Wednesday after a major South Korea-based cryptocurrency exchange, Bithumb, admitted hackers made off with more than $31 million worth of virtual currency."), available at https://www.washingtonpost.com/news/the-switch/wp/2018/06/20/why-bitcoin-exchanges-keep-getting-hacked-and-how-to-protect-yourself/?utm_term=.ab72f3bcf185.

24.     Since 2011, there have been 56 documented hacks of cryptocurrency exchanges.  See Lauren Yates, *Memorandum re Meeting With Bitwise Asset Management, Inc., NYSE Arca, Inc., and Vedder Price P.C.*, SEC, Mar. 20, 2019, available at https://www.sec.gov/comments/sr-nysearca-2019-01/srnysearca201901-5164833-183434.pdf.  These hacks have cost exchanges billions of dollars:



25.     These risks require Payward to take extraordinary measures to maintain the security of its operations.  Payward's industry success thus far is due in part to its ability to repel those attacks.

Payward has gone to great lengths to maintain the security of its business and customer data and secrecy of its trade secrets.

26. Among its customer-facing security measures, Payward employs access control systems, encrypted email, and employees trained to identify and mitigate account intrusions.

27. Payward uses similarly extensive electronic security measures for its employees and internal systems, including, for example, utilization of secure and encrypted internal communications systems, secure hardware and software, and employees trained to identify and mitigate electronic threats.

28. In addition to electronic hacking risks, Payward's offices, servers, and employees are subject to constant physical security threats, such as hacking and kidnapping. There has been a recent spate of kidnappings designed to secure hefty cryptocurrency ransoms. For example, on December 26th of 2017, an analyst in Ukraine who worked for one of the largest European cryptocurrency exchanges was bundled into a car and whisked away by armed men wearing balaclavas. The analyst remained kidnapped for five months until the ransom of $1 million Bitcoin was paid, at which point the analyst was returned alive. See Greg Thomson, Cryptocurrency Kidnappings – New Dogs with the Same Old Tricks, Blockonomi, May 30, 2018.

29. To protect against these physical threats, Payward employs extensive physical security measures. Those include measures to keep confidential the physical addresses of its offices, and headquarters. Among other things, Payward strictly instructs its employees not to disclose its physical addresses. Payward requires that visitors receive pre-approval and limits visitor access. Payward requires both employees and visitors to sign non-disclosure agreements. Additionally, Payward uses a mailing address that is geographically distinct from its headquarters' address as its official public address.

30. As an employee working from Payward's San Francisco headquarters, Plaintiff signed a non-disclosure agreement and knew about the electronic and physical security measures Payward employs.

### B. Defendant's Employment With Payward

31. On March 18, 2018, Payward sent Defendant an at-will employment offer for the position of financial analyst. The offer was contingent upon Defendant signing Payward's Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement"). The Confidentiality Agreement required Defendant to protect confidential information, in part, as follows:

> (a) <u>Protection of Information</u>. I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company. I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item of items involved. I further agree not to make copies of such Confidential Information except as authorized by the Company.

The Confidentiality Agreement defined Confidential Information as follows:

> (b) <u>Confidential Information</u>. I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential information includes, without limitation: (i) Company Inventions [ ]; and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to,

customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

32. The Confidentiality Agreement also specifically mandates the immediate return of Company property and documents, including Company-issued laptops such as the one Defendant was provided and used:

> 5. <u>Company Property; Returning Company Documents</u>.  I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitations, files, e-mail messages, and voice messages) . . . .  I agree that, at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

33. Defendant signed the Confidentiality Agreement on March 14, 2018 and began work on March 26, 2018.  Payward terminated Defendant's employment on August 1, 2019.

**C.    Defendant Misappropriates his Company Laptop and Breaches the Confidentiality Agreement**

34. Upon his employment, Payward issued Defendant a Company laptop for exclusive use for Company business.  The Company laptop was loaded with software and applications not known to the general public that Payward relies upon to conduct its business operations.  Revealing those software and applications would create security vulnerabilities for Payward because hackers would know what software and applications to exploit to attempt to hack Payward's systems.

35. The Company laptop also contained proprietary computer programming for Payward's business operations that would result in a significant threat to Payward's systems if exposed.

36. In addition, the Company laptop contained extensive financial data and information from both Payward and its customers, other sensitive customer data, and confidential business information that, again, if publicly exposed or obtained by a bad actor or competitor would pose a significant risk to the security of Payward's systems and a threat to Payward's competitive advantages.

37. Upon Defendant's termination on August 1, 2020, Payward directed Defendant to immediately return his Company laptop and any other Company property. The Confidentiality Agreement imposed an independent obligation to return the laptop, and any other Company property Defendant possessed, immediately upon his termination under the Confidentiality Agreement. Defendant failed to do so.

38. Instead, despite repeated attempts by Payward to collect the laptop from Defendant, he refused to return the laptop to Payward. Defendant intentionally misappropriated his Company laptop in direct violation of the Confidentiality Agreement for at least four additional weeks.

39. Defendant strung Payward along with false promises to return the laptop while he could continue to access the confidential and trade secret information on the laptop. On August 2, 2019, Defendant claimed he could not return the laptop to Payward because he may be going on a vacation. On August 6, 2019, he stated he would keep Payward updated on his return from vacation and when he could return the laptop. Payward followed up with Defendant on August 14, 2019, seeking clarity on when Defendant would return the laptop. In response, Defendant sent Payward a series of emails stating he would return the laptop on successively later dates.

40. Eventually, Defendant stated he would return the laptop to Payward on August 29, 2019. However, when that date arrived, Defendant emailed Payward along with his personal lawyers and said the laptop had been stolen from his vehicle. To date, the laptop has not been recovered.

41. As a former financial analyst for Payward, Defendant knew the value of the data on his Company laptop and was aware of the risks posed by his misappropriation. Defendant knew that he had an obligation to return the Company laptop immediately upon his termination, not at some future time of his choosing after he took and returned from a vacation. Defendant knew that he was under an obligation to protect Payward's confidential Company information and trade secrets. Despite this, Defendant did not return the laptop to Payward immediately upon his termination. Instead, he kept the laptop in his possession, despite multiple requests from Payward that he return the laptop. He continued to access the confidential business and customer information and trade secrets on the laptop. On the day he finally stated he was going to return the laptop, he purportedly negligently and recklessly placed his Company laptop in the trunk of his vehicle and left the vehicle unattended on the street for three hours, and the laptop was stolen.

**D.    Defendant Continued to Access Trade Secrets and Confidential Business Information After Misappropriating it**

42. During the time Defendant improperly and unlawfully retained the laptop, he continued to access the trade secrets and confidential business and customer information on his Company laptop. Defendants became aware he was accessing and sharing the confidential and trade secret information contained in the laptop because, among other things, he produced a copy of confidential Company board minutes in connection with his threat of a lawsuit against Payward, which he eventually filed in San Francisco Superior Court. Plaintiff would only have access to the board minutes through his employment at Payward.

43. On October 25, 2019 Defendant produced a confidential copy of Payward's November 2017 board minutes with correspondence pertaining to his pre-litigation demand letter. Defendant would not have had access to that document except through his misappropriation of a physical copy of those minutes or his continued access to Company property on his Company laptop.

44. The board minutes are the tip of the iceberg: Defendant's laptop contains extensive trade secrets and confidential business records, including sensitive financial and banking

information, business plans, revenue sources, and much more, all accumulated over his year-and-a-half employment by Payward as a financial analyst that reported directly to Payward's CFO.

45. Defendant continued to access Payward's confidential and trade secret information on the laptop up to August 29, 2019, the date the laptop was purportedly stolen and twenty-eight days after he was contractually and legally bound to return the laptop to Payward.

**E.    Defendant Violates the Confidentiality Agreement by Exposing Payward's Non-Public Address**

46. On November 26, 2019, Defendant publicly filed an employment lawsuit against Payward in San Francisco Superior Court (Case No. CGC-19-581099).  In his complaint, Defendant disclosed the non-public physical address of Payward's headquarters—information that Defendant knew only through his employment with Pawyard and knew was kept confidential.

47. Payward goes to great lengths to keep its headquarters' physical address confidential.  As a former employee that worked at Payward's headquarters, Defendant knew that Payward's physical business address was considered confidential information and was highly protected.  Defendant knew that Payward only made available to the public as its official business address a different and geographically distinct mailing address.

48. Defendant's publication of the physical address of Payward's headquarters breached the Confidentiality Agreement and Payward's standard confidentiality practices, which are and were well known to Defendant.

49. Instead, Defendant unnecessarily included the confidential and non-public address of Payward's headquarters in both his November 26, 2019 complaint and again in his January 3, 2020 first amended complaint.  Defendant's actions were deliberate and malicious—he had sent Payward several draft complaints before filing his lawsuit, and the publicly filed suit was the first time Defendant included the headquarters' confidential address.

50. Defendant's public disclosure of Payward's physical address caused Payward harm.  Several industry publications reported on Runyon's lawsuit and drew additional attention

to his complaint.[1] As a direct result of Defendant's actions, Payward was required to undertake additional and significant security measures to protect against the harm of Defendant's unlawful exposure of the address. Among other measures, Payward adopted additional physical security following Defendant's public disclosure. This additional physical security alone has presently cost Payward more than $30,000. Payward expects to continue incurring substantial costs that would have been avoided or mitigated had Runyon maintained the location's confidentiality.

# FIRST CLAIM FOR RELIEF:

## MISAPPROPRIATION OF TRADE SECRETS
## UNDER THE DEFEND TRADE SECRETS ACT OF 2016

51. Payward repeats and re-alleges the allegations contained in paragraphs 1 through 52 of this Complaint as though fully set forth herein.

52. Payward owned trade secret information as defined under 18 U.S.C. § 1839(3) and took reasonable steps to protect it.

53. Payward's trade secret information derived independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of Payward's trade secrets. Among other economic value, Payward's confidential board minutes and financial information would be valuable to its competitors seeking insight into Payward's operations. Payward's physical address would be valuable to thieves or hackers seeking an inroad to Payward's secure systems.

54. Defendant had access to Payward's trade secret information during his employment and on his Company laptop.

---

[1] See Daniel Palmer, Kraken, the U.S.-based cryptocurrency exchange, is being sued by an ex-employee who alleges the company unfairly fired him for raising serious issues with its business practices, Coindesk (Dec. 19, 2019, 12:30 UTC), https://www.coindesk.com/ex-kraken-employee-alleges-unethical-and-illegal-tactics-in-discrimination-lawsuit; Ana Alexandre, Former Kraken Employee Sues Exchange for 'Unethical and Illegal Business Tactics,' Coin Telegraph (Dec. 18, 2019), https://cointelegraph.com/news/former-kraken-employee-sues-exchange-for-unethical-and-illegal-business-tactics; Sam Webb, Ex-Kraken employee claims exchange violated US sanctions, Yahoo Finance (Dec. 18, 2019), https://finance.yahoo.com/news/ex-kraken-employee-claims-exchange-160044119.html.

55. Payward's trade secret information to which Defendant had access relates to Payward's cryptocurrency trading services, which are offered and provided in interstate commerce.

56. Either during or after his employment, Defendant violated Payward's contractual restrictions on unauthorized copying of Company documents. Payward implemented these restrictions to enhance its information security.

57. After his termination, Defendant misappropriated Payward's trade secret information by maliciously and willfully refusing and failing to return his Company laptop and other Company property, including Payward's confidential board minutes.

58. Defendant used and disclosed Payward's trade secret information without authorization.

59. As a result of Defendant's misappropriation of Payward's trade secret information, Defendant violated the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1836(b)(1)).

60. As a direct and proximate result of Defendant's violation of the DTSA, Payward has sustained substantial damages in an amount that will be established at trial.

61. Defendant's actions in converting and misappropriating Payward's trade secret information for his own purposes was willful, wanton, and malicious, and was taken with reckless disregard for Payward's rights.

62. Defendant's actions have caused and will continue to cause Payward irreparable harm if not preliminarily and permanently enjoined.

63. Payward has no adequate remedy at law.

64. Accordingly, Payward further requests that the Court enjoin Defendant from utilizing any trade secret information obtained from Payward in any way.

## SECOND CLAIM FOR RELIEF:

### MISAPPROPRIATION OF TRADE SECRETS UNDER THE CALIFORNIA UNIFORM TRADE SECRETS ACT

65. Payward repeats and re-alleges the allegations contained in paragraphs 1 through 61 of this Complaint as though fully set forth herein.

66. Payward owned trade secret information as defined under California Civil Code § 3426.1(d) and took reasonable steps to protect it. Defendant had access to Payward's trade secret information during his employment and on his Company laptop.

67. After his termination, Defendant misappropriated Payward's trade secret information by maliciously and willfully refusing and failing to return his Company laptop and other Company property, including Payward's confidential board minutes.

68. Defendant used and disclosed Payward's trade secret information without authorization.

69. As a result of Defendant's misappropriation, use, and disclosure of Payward's trade secret information, Defendant violated the California Uniform Trade Secrets Act ("CUTSA") (Cal. Civ. Code, § 3426 *et seq.*).

70. As a direct and proximate result of Defendant's violation of the CUTSA, Payward has sustained substantial damages in an amount that will be established at trial of this matter.

71. Defendant's actions in converting and misappropriating Payward's trade secret information for his own purposes was willful, wanton, and malicious, and was taken with reckless disregard for Payward's rights.

72. Defendant's actions have caused and will continue to cause Payward irreparable harm if not preliminarily and permanently enjoined. Accordingly, Payward further requests that the Court enjoin Defendant from utilizing any trade secret information obtained from Payward in any way.

73. Upon information and belief, Defendant's misappropriation of Payward's trade secrets has been willful and malicious in light of Defendant's refusal to return the laptop as required upon his termination and in accordance with the terms of the Confidentiality Agreement, and his misappropriation of trade secret information for his benefit. Therefore, Payward is entitled to an award of punitive or exemplary damages and attorneys' fees pursuant to California Civil Code sections 3426.3(c) and 3426.4.

# THIRD CLAIM FOR RELIEF:
## UNLAWFULLY ACCESSING A PROTECTED COMPUTER UNDER THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C § 1030)

74. Payward repeats and re-alleges the allegations contained in paragraphs 1 through 70 of this Complaint as though fully set forth herein.

75. Payward gave Defendant, as part of his employment with Payward, access to a protected computer that was used in and affecting interstate and foreign commerce and communication.

76. Defendant's access to the protected computer was conditioned on his compliance with the Confidentiality Agreement and his authorization was automatically revoked when he violated its terms. Pursuant to the Confidentiality Agreement, Defendant's access was again revoked when Payward terminated his employment. Additionally, Payward specifically revoked Defendant's access to the protected computer upon the termination of his employment.

77. Defendant thereafter knowingly and intentionally accessed the protected computer without authorization and in excess of authorized access and obtained data and information of value therefrom.

78. Defendant thereafter knowingly and intentionally accessed the protected computer without authorization and in excess of authorized access and obtained data and information containing financial records and from financial institutions.

79. Defendant thereafter knowingly and intentionally, with the intent to defraud, accessed the protected computer without authorization and in excess of authorized access and obtained data and information of value therefrom.

80. Defendant thereafter knowingly and intentionally accessed the protected computer without authorization and in excess of authorized access and, as a result of such conduct, caused and recklessly caused damage to the protected computer and to Payward.

81. Defendant's unauthorized access of the protected computer has caused and will continue to cause damages exceeding $5,000 per one-year period.

# FOURTH CLAIM FOR RELIEF:
## BREACH OF CONTRACT

82. Payward repeats and re-alleges the allegations contained in paragraphs 1 through 75 of this Complaint as though fully set forth herein.

83. Defendant entered into a valid contract with Payward—the Confidential Information and Invention Assignment Agreement.

84. Payward performed substantially all significant things that it was required to do under the contract.

85. Defendant breached the contract by: (1) misappropriating Payward's trade secret information and confidential business information; and (2) publicly disclosing Payward's non-public business address.

86. Defendant's breach caused Payward harm in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A. An order that Defendant return to Payward all property belonging to Payward and to enjoin Defendant from any further use of Payward's trade secret information.

B. Compensatory damages in an amount to be proven at trial;

C. Punitive damages;

D. Restitution, in an amount to be proven at trial;

E. Costs of suit herein;

F. Pre-judgment and post-judgment interest; and

G. Such other and further relief as the Court deems just and proper.

Dated: March 27, 2020                     Respectfully submitted,

**PIERCE BAINBRIDGE BECK PRICE & HECHT LLP**

By: /s/ Andrew E. Calderon
Andrew E. Calderon (SBN 316673)
acalderon@piercebainbridge.com

355 South Grand Ave., 44th Floor
Los Angeles, California 90071
(213) 262-9333

Christopher N. Lavigne (NY Bar No. 4811121)
(Pending *Pro Hac Vice* admission)
clavigne@piercebainbridge.com
277 Park Avenue, 45th Floor
New York, NY 10172
Tel.: (646) 694-9666
Fax: (646) 968-412

*Counsel for Plaintiff Payward, Inc., d/b/a Kraken*

# DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Payward, Inc., d/b/a Kraken hereby demands a trial by jury in this action of all issues so triable.

Dated: March 27, 2020

Respectfully submitted,

**PIERCE BAINBRIDGE BECK PRICE & HECHT LLP**

By: /s/ Andrew E. Calderon
Andrew E. Calderon (SBN 316673)
acalderon@piercebainbridge.com
355 South Grand Ave., 44th Floor
Los Angeles, California 90071
(213) 262-9333

Christopher N. Lavigne (NY Bar No. 4811121)
(Pending *Pro Hac Vice* admission)
clavigne@piercebainbridge.com
277 Park Avenue, 45th Floor
New York, NY 10172
Tel.: (646) 694-9666
Fax: (646) 968-412

*Counsel for Plaintiff Payward, Inc., d/b/a Kraken*